rah/200400621

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :     Hon. Harold Q. Ackerman

          v.                       :     Crim. No. 05-75

NICHOLAS INFANTINO                 :     18 U.S.C. § 371
                                   :     26 U.S.C. § 7201

## I N F O R M A T I O N

The defendant having waived in open court prosecution
by Indictment, the United States Attorney for the District of New
Jersey charges:

### COUNT ONE
(Conspiracy to Commit Bank Fraud)

1.   At all times relevant to this Information:

a.   Lehman Brothers Bank, FSB (hereinafter
"Lehman"), with offices at 399 Park Avenue, New York, New York,
was a financial institution within the meaning of Title 18,
United States Code, Section 20, and a subsidiary of Lehman
Brothers Holdings, Inc., and was engaged in the business of
making residential mortgage loans to the public;

b.   Aurora Loan Services, Inc. (hereinafter
"Aurora"), with offices in Gaithersburg, Maryland, was also a
subsidiary of Lehman Brothers Holdings, Inc., and was engaged in
underwriting and servicing the mortgage loans funded by Lehman
Brothers Bank;

c.   Commerce Bank, North (hereinafter "Commerce"),
with a branch office at 1000 Lake Street, Ramsey, New Jersey, was

a financial institution within the meaning of Title 18, United
States Code, Section 20, and was engaged in the business of
making residential mortgage loans to the public (Lehman Brothers
Bank, Aurora Loan Services, and Commerce Bank hereinafter
referred to collectively as the "Lenders");

       d.   Consultant B.R., who is named as a
coconspirator but not as a defendant herein, owned and/or
controlled the operations of M.S. Financial Services, Inc.
(hereinafter "M.S. Financial"). M.S. Financial, with offices in
Montclair and later Verona, New Jersey, purported to manage and
oversee real estate investment transactions. Consultant B.R.'s
responsibilities included preparing and causing the preparation
of false and fraudulent documents for closings on parcels of real
property, managing the real property after the closings, and
distributing the mortgage loan proceeds fraudulently obtained
from the Lenders;

       e.   Attorney D.E., who is named as a coconspirator
but not as a defendant herein, was an attorney admitted to
practice in the State of New Jersey. Attorney D.E. was employed
by Consultant B.R. at M.S. Financial Services, and was
responsible for preparing false and fraudulent closing documents,
conducting real estate closings, and acting as a settlement agent
on behalf of a title company at the closings;

       f.   Defendant NICHOLAS INFANTINO, a resident of
Pompton Plains, New Jersey, was a mortgage broker. His
responsibilities included identifying individuals willing to pose

-2-

as nominee buyers for the purchase of real property, obtaining from them basic identifying and financial information, causing the preparation of fraudulent loan applications in their names, and submitting and causing the submission of these fraudulent applications to the Lenders;

g.  Consultant J.D., who is named as a coconspirator but not as a defendant herein, owned and/or controlled the operations of Diamond Star Financial.  Diamond Star Financial, with offices in Leonia and later Fort Lee, New Jersey, purported to provide assistance to individuals seeking to invest in real estate.  Consultant J.D.'s responsibilities included identifying individuals willing to pose as nominee buyers, establishing relationships with real estate brokers, mortgage brokers, and others in the real estate business, identifying real property for sale, negotiating the purchase of the real property, causing the preparation of fraudulent loan applications and false financial documents for the nominee buyers, causing the submission of fraudulent mortgage loan applications to the Lenders, and directing the distribution of mortgage loan proceeds fraudulently obtained from the Lenders;

h.  Consultant S.W., who is named as a coconspirator but not as a defendant herein, owned and/or controlled the operations of New Life Investments.  New Life Investments, with offices in East Orange, New Jersey, purported to purchase, refurbish, and resell homes.  Consultant S.W.'s responsibilities included identifying individuals willing to pose

as nominee buyers of real property, obtaining inflated appraisals
on the subject properties, and managing construction on the
purchased properties; and

2. At various times relevant to this Information,
nominee buyers James Campbell, a/k/a "Thomas Goldson"
(hereinafter "Campbell"); Brian Togneri (hereinafter "Togneri");
Brandi Mohammed (hereinafter "Mohammed"); Anel Mendez
(hereinafter "Mendez"); and Carl DiMasi (hereinafter "DiMasi")
(Campbell, Togneri, Mohammed, Mendez, and DiMasi hereinafter
referred to collectively as the "Nominee Buyers"), in exchange
for a fee, agreed to serve as purchasers in name only of the
following parcels of real property (hereinafter referred to
collectively as the "Nominee Properties"):

| PROPERTY | LOCATION | NOMINEE BUYER |
|----------|----------|---------------|
| Nominee Property 1 | 15 Schaffer Rd., Alpine, New Jersey | DiMasi |
| Nominee Property 2 | 497 Piermont Rd., Cresskill, New Jersey | Campbell |
| Nominee Property 3 | 66 Chestnut Ridge Rd., Saddle River, New Jersey | Campbell |
| Nominee Property 4 | 21 Christopher Place, Saddle River, New Jersey | Mohammed |
| Nominee Property 5 | 71 Woodcliff Lake Rd., Saddle River, New Jersey | Mendez |
| Nominee Property 6 | 133 Chestnut Ridge Rd., Saddle River, New Jersey | Togneri |

## The Conspiracy

3.    From in or about February 2002 to in or about May 2003, in the District of New Jersey and elsewhere, defendant

### NICHOLAS INFANTINO

did knowingly and willfully conspire with others to execute a scheme and artifice to defraud financial institutions, and to obtain money and property under the custody and control of financial institutions, by means of materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

## The Primary Object of the Conspiracy

4.    The primary object of the conspiracy was to fraudulently induce the Lenders to make mortgage loans to the Nominee Buyers that were in excess of the true purchase price of the Nominee Properties, and to distribute the excess mortgage proceeds to the conspirators in the scheme.

## The Means of the Conspiracy

5.    Among the means employed by defendant NICHOLAS INFANTINO and his coconspirators to carry out the conspiracy and to effect its unlawful objects were the following:

a.    From in or about February 2002 to in or about October 2002, Consultant J.D., Consultant S.W., and defendant NICHOLAS INFANTINO recruited the Nominee Buyers to act in name only as the purchasers of the Nominee Properties, in exchange for a fee. The Nominee Buyers agreed to act as the purchasers of the Nominee Properties, knowing that they had no intention of owning,

-5-

and would not in fact own, the Nominee Properties.  The Nominee
Buyers further agreed to act as nominee borrowers for mortgage
loans fraudulently obtained from the Lenders and secured by the
Nominee Properties, knowing that they had no intention or
capability of repaying these mortgage loans.

b.   From in or about February 2002 to in or about
October 2002, Consultant J.D., acting in the names of the Nominee
Buyers, entered into contracts for the purchase of the Nominee
Properties.  In order to obtain mortgage loans in excess of the
true purchase prices of the Nominee Properties, Consultant J.D.
and defendant NICHOLAS INFANTINO fraudulently caused second,
falsified sales contracts to be prepared without the knowledge or
authorization of the sellers of the Nominee Properties.  These
second, falsified contracts fraudulently reflected the following
inflated purchase prices:

| PROPERTY | TRUE PURCHASE PRICE | FALSELY INFLATED PURCHASE PRICE |
|---|---|---|
| Nominee Property 1 | $3.8 million | $5.9 million |
| Nominee Property 2 | $1.1 million | $2.05 million |
| Nominee Property 3 | $1.5 million | $3.2 million |
| Nominee Property 4 | $1.8 million | $3.5 million |
| Nominee Property 5 | $2.8 million | $5.5 million |
| Nominee Property 6 | $1.78 million | $4.4 million |

c.   Consultant J.D. and defendant NICHOLAS
INFANTINO caused to be forged on these second, falsified
contracts the signatures of the sellers of the Nominee Properties
and eventually caused the contracts to be submitted to the

-6-

Lenders in support of fraudulent mortgage loan applications, as more fully described below.

        d.   From in or about February 2002 to in or about November 2002, defendant NICHOLAS INFANTINO, acting in the names of the Nominee Buyers, caused to be submitted materially false and fraudulent mortgage loan applications to Aurora, as agent for Lehman, for the purchases of the Nominee Properties. In support of these false and fraudulent applications, defendant INFANTINO also caused the following documents to be submitted:

        i.   For Nominee Buyers Campbell, Mohammed, and Mendez, false and fraudulent IRS forms W-2 showing the following falsely inflated incomes:

| NOMINEE BUYER | ACTUAL REPORTED INCOME (APPROXIMATE) | INCOME ON FALSE W-2 (APPROXIMATE) |
|---|---|---|
| Campbell | $16,000 | $500,000 |
| Mohammed | $35,000 | $600,000 |
| Mendez | $40,000 | $600,000 |

        ii.   For Nominee Buyers DiMasi and Togneri, letters from a purported Certified Public Accountant attesting that DiMasi and Togneri were successfully self-employed, whereas in fact they were both bartenders at a restaurant; and

        iii.   For each of the Nominee Buyers, false and fraudulent bank account statements showing average account balances that were falsely inflated above the Nominee Buyers' actual account balances during the same time period as follows:

| NOMINEE BUYER | ACTUAL ACCOUNT BALANCE (APPROXIMATE) | AVERAGE ACCOUNT BALANCE ON FALSE BANK STATEMENT (APPROXIMATE) |
|---|---|---|
| DiMasi | $7,000 | $1.5 million |
| Campbell (Nominee Property 2) | no accounts with positive balance | $1.2 million |
| Campbell (Nominee Property 3) | $10,000 | $1.8 million |
| Mohammed | $3,800 | $1.3 million |
| Mendez | $65,000 | $2.7 million |
| Togneri | $300 | $795,000 |

e.  From in or about April 2002 to in or about December 2002, defendant NICHOLAS INFANTINO, acting in the name of the Nominee Buyers, caused materially false and fraudulent second mortgage loan applications to be submitted to Commerce containing the same false financial information set forth in Paragraph 4(d), above, regarding each of the Nominee Properties except Nominee Property 3.

f.  From in or about April 2002 to in or about November 2002, based in part on the falsely inflated prices in the second, falsified contracts and the fraudulent misrepresentations regarding the income and account balances of the Nominee Buyers, Lehman agreed to issue mortgage loans to be secured by each of the Nominee Properties.  Lehman funded these loans through wire transfers to the attorney trust account of Attorney D.E., made on or about the following dates:

| PROPERTY | AMOUNT OF LOAN | DATE FUNDED |
|----------|----------------|-------------|
| Nominee Property 1 | $3.835 million | 12/3/02 |
| Nominee Property 2 | $1.435 million | 4/29/02 |
| Nominee Property 3 | $2.24 million | 10/18/02 |
| Nominee Property 4 | $2.45 million | 8/27/02 |
| Nominee Property 5 | $3.575 million | 10/31/02 |
| Nominee Property 6 | $2.86 million | 8/20/02 |

g.   From in or about April 2002 to in or about December 2002, Attorney D.E. and Consultant B.R. prepared various closing and mortgage loan documents relating to the mortgage loans issued by Lehman, knowing that the mortgage loans had been obtained based on false and fraudulent information.   From in or about April 2002 to in or about December 2002, these fraudulent closing and mortgage loan documents were executed by each of the Nominee Buyers.

h.   From in or about April 2002 to in or about December 2002, based in part on the falsely inflated price in the second, falsified contracts and the fraudulent misrepresentations regarding the income and account balances of the Nominee Buyers, Commerce agreed to issue second mortgage loans in the following amounts, to be secured by each of the Nominee Properties except Nominee Property 3:

| PROPERTY | AMOUNT OF SECOND LOAN | DATE FUNDED |
|----------|----------------------|-------------|
| Nominee Property 1 | $885,000 | 12/9/02 |
| Nominee Property 2 | $205,000 | 4/30/02 |
| Nominee Property 4 | $350,000 | 9/17/02 |
| Nominee Property 5 | $825,000 | 11/7/02 |
| Nominee Property 6 | $660,000 | 9/12/02 |

i. From in or about April 2002 to in or about December 2002, Attorney D.E. and Consultant B.R. prepared various closing and mortgage loan documents relating to the second mortgage loans issued by Commerce, knowing that the mortgage loans had been obtained based on false and fraudulent information. From in or about April 2002 to in or about December 2002, these fraudulent closing and mortgage loan documents were executed by various coconspirators in the names of the Nominee Buyers.

j. Beginning in or about May 2002, and in order to conceal the fraudulent activity of the conspiracy, Consultant B.R. and Consultant J.D. made, and directed to be made, regular periodic mortgage payments to the Lenders, and also made, and directed to be made, payments to each of the coconspirators consisting of monies from the proceeds of the fraudulently-obtained mortgage loans.

k. In addition to the fraudulent mortgage loans on the Nominee Properties, from in or about April 2002 to in or about December 2002, defendant NICHOLAS INFANTINO and his coconspirators also arranged for and obtained from Lehman and

Commerce fraudulent mortgage loans on two other parcels of real
property:   7 Cassandra Drive, Alpine, New Jersey; and 21 Schaffer
Road, Alpine New Jersey.   Using second, falsified contracts and
fraudulent loan applications in a manner similar to that
described above, defendant INFANTINO and his coconspirators
caused Lehman, Commerce, and a third mortgage company, Rose
Mortgage Corporation ("Rose Mortgage"), to fund the following
additional, fraudulently-obtained mortgage loans:

| PROPERTY | LENDER | AMOUNT OF LOAN |
|---|---|---|
| 7 Cassandra Dr., Alpine, New Jersey | Lehman | $2.975 million |
| 7 Cassandra Dr., Alpine, New Jersey | Commerce | $600,000 |
| 21 Schaffer Rd., Alpine, New Jersey | Lehman | $2.925 million |
| 21 Schaffer Rd., Alpine, New Jersey | Commerce | $885,000 |
| 21 Schaffer Rd., Alpine, New Jersey | Rose Mortgage | $2.925 million |

### Amount of Loss

6.   As a result of the conspiracy described above,
Lehman and Commerce incurred, and defendant NICHOLAS INFANTINO
and his coconspirators intended that Lehman and Commerce would
incur, approximately $13 million in reasonably foreseeable
pecuniary harm.

### Overt Acts

7. In furtherance of the conspiracy, and in order to effect the object thereof, defendant NICHOLAS INFANTINO and one or more of his coconspirators committed, and caused to be committed, the following acts in the District of New Jersey and elsewhere:

a-f. On or about the dates set forth below, in the District of New Jersey and elsewhere, defendant NICHOLAS INFANTINO and Consultant J.D. caused the following fraudulent sales contracts containing falsely inflated purchase prices to be prepared without the knowledge or authorization of the sellers of the Nominee Properties:

| OVERT ACT | APPROXIMATE DATE | PROPERTY | TRUE PURCHASE PRICE | FALSELY INFLATED PURCHASE PRICE |
|---|---|---|---|---|
| 6a | 12/3/02 | Nominee Property 1 | $3.8 million | $5.9 million |
| 6b | 4/29/02 | Nominee Property 2 | $1.1 million | $2.05 million |
| 6c | 10/18/02 | Nominee Property 3 | $1.5 million | $3.2 million |
| 6d | 8/27/02 | Nominee Property 4 | $1.8 million | $3.5 million |
| 6e | 10/31/02 | Nominee Property 5 | $2.8 million | $5.5 million |
| 6f | 8/20/02 | Nominee Property 6 | $1.78 million | $4.4 million |

All in violation of Title 18, United States Code, Section 371.

-12-

## COUNT TWO
(Tax Evasion)

1.    Paragraphs 1 and 3 through 6 of Count One of this Information are realleged and incorporated as though set forth in full herein.

2.    From on or about January 1, 2002, through on or about December 31, 2002, defendant NICHOLAS INFANTINO worked as a contract employee for two mortgage companies, United Mortgage Services ("United") and One Source Mortgage ("One Source"). Defendant INFANTINO brokered the fraudulently-obtained mortgage loans described in Count One of this Information through United and One Source.

3.    During this time period, defendant NICHOLAS INFANTINO worked for United and One Source pursuant to profit-sharing agreements that he had entered into with these companies. Under the profit-sharing agreement with United, defendant INFANTINO was entitled to retain only 25 percent of the commission on any mortgage loan under $400,000 defendant INFANTINO brokered through United, and only 50 percent of the commission on any mortgage loan of $400,000 or more defendant INFANTINO brokered through United.  Under the profit-sharing agreement with One Source, defendant INFANTINO was entitled to retain only 30 percent of the commission on any mortgage loan defendant INFANTINO brokered through One Source, regardless of amount.   Defendant INFANTINO was to receive his share of these commissions directly from United and One Source.

-13-

4.    Pursuant to these agreements with United and One Source, defendant NICHOLAS INFANTINO during calendar year 2002 received approximately $321,864 in commissions directly from United and approximately $245,639 in commissions directly from One Source.  The majority of these commissions were derived from the fraudulently-obtained mortgage loans involved in the scheme described in Count One of this Information.

5.    During this time period, defendant NICHOLAS INFANTINO received an additional approximately $8,729 from Rose Mortgage, representing his commission for brokering the fraudulently-obtained second mortgage described in Paragraph 5(k) of Count One of this Information.

6.    From on or about January 1, 2002, to on or about December 31, 2002, defendant NICHOLAS INFANTINO surreptitiously received additional commission payments in the form of "bonuses" or "kick backs" from his coconspirators on each of the fraudulently-obtained mortgage loans that he had brokered through United and One Source.  Specifically, during this time period defendant INFANTINO received the following additional payments:

a.    Several checks totaling approximately $68,390, drawn on the attorney trust account of Attorney D.E.;

b.    Two checks totaling approximately $52,500, drawn on a bank account held in the name of MS Financial Services;

c.    One check totaling $5,000, drawn on the bank account of Nominee Buyer Togneri; and

-14-

d.   One check totaling $5,000, drawn on the bank account of Nominee Buyer DiMasi.

7.   In breach of his profit-sharing agreements with United and One Source, defendant NICHOLAS INFANTINO at no time disclosed any of the additional commission income to either United or One Source, nor did he share the income with either United or One Source according to the predetermined formulas.

8.   As a result of this breach of the profit-sharing agreement, United issued an IRS Form 1099-MISC to defendant NICHOLAS INFANTINO that reported annual income in the amount of approximately $321,864, when in fact, defendant INFANTINO's actual income was much higher.

9.   During calendar year 2002, defendant NICHOLAS INFANTINO had and received taxable income in approximately the following amounts:

    a.   $321,864 from United;

    b.   $245,639 from One Source;

    c.   $8,729 from Rose Mortgage;

    d.   $68,390 from Attorney D.E.;

    e.   $52,500 from MS Financial Services;

    f.   $5,000 from Nominee Buyer Togneri; and

    d.   $5,000 from Nominee Buyer DiMasi.

This income totaled approximately $707,122, upon which a tax of approximately $239,028 was due and owing to the United States.

10.   At no time on or before April 15, 2003, did defendant NICHOLAS INFANTINO file a United States Individual

Income Tax Return for the calendar year 2002.

11.  On or about April 15, 2003, in Pompton Plains, in the District of New Jersey and elsewhere, defendant

NICHOLAS INFANTINO

knowingly and willfully did attempt to evade and defeat a substantial part of the income tax due and owing by him to the United States for calendar year 2002 by concealing income from the brokerage of mortgage loans, as described in Paragraphs 2 through 7 of this Count.

In violation of Title 26, United States Code, Section 7201.

CHRISTOPHER J. CHRISTIE
United States Attorney